IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

WESLEY C.  LOVE,

                    Plaintiff,                           No. 3:11-cv-804-HZ

     v.

MICHAEL J. ASTRUE,                    OPINION & ORDER
Commissioner of Social Security,

                    Defendant.


Lisa R. Porter
KP LAW LLC
16200 S.W. Pacific Hwy, Suite H-233
Portland, Oregon 97224

       Attorney for Plaintiff

S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
/ / /
/ / /


1 - OPINION & ORDER

Adrian L. Brown
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

Keith Simonson
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Social Security Administration, Office of the General Counsel
1301 Young Street, Suite A-702
Dallas, Texas 75202

   Attorneys for Defendant

HERNANDEZ, District Judge:

   Plaintiff Wesley Love brings this action seeking judicial review of the Commissioner's

final decision to deny supplemental security income (SSI) and disability insurance benefits (DIB)

before January 1, 2009.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated

by 42 U.S.C. § 1382(c)(3)).  I affirm the Commissioner's decision.

PROCEDURAL BACKGROUND

   Plaintiff applied for DIB and SSI on December 5, 2007, alleging an onset date of

November 2, 2002.[1]  R. 202-09.  His applications were denied initially and on reconsideration.

R. 97-100, 105-21.

   On May 6, 2010, plaintiff appeared, with counsel, for a hearing before an Administrative

Law Judge (ALJ).  R. 35-92.  On May 14, 2010, the ALJ found plaintiff not disabled before

January 1, 2009, and disabled after that date.  R. 15-30.  Plaintiff appealed the unfavorable

portion of the ALJ's decision to the Appeals Council which denied review.  R. 1-4.

/ / /

---

   [1]  During the hearing, plaintiff amended his onset date to October 17, 2006, the day after
he was fired from performing his job as a coffee roaster.  R. 19, 40-43.

2 - OPINION & ORDER

FACTUAL BACKGROUND

Plaintiff alleges disability based on "DLE" and degenerative joint disease.  R. 238.  He also states that he has a lack of focus, is "depressed to death," and experiences acute pain, especially when squatting and kneeling.  Id.  At the time of the hearing, he was forty-seven years old.  R. 202 (noting date of birth).  He finished high school and attended "a little bit" of college, studying to be a corrections officer.  R. 50.  He has past relevant work experience as a coffee roaster.  R. 28, 255, 257.  Because the parties are familiar with the medical and other evidence of record, I refer to any additional relevant facts necessary to my decision in the discussion section below.

SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure.  See Valentine v. Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the

3 - OPINION & ORDER

claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

THE ALJ'S DECISION

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date. R. 22. Next, at step two, the ALJ determined that plaintiff had the following severe impairments after the amended onset date of October 17, 2006: residuals of crush injury to the right foot, degenerative joint disease of the knees, and synovitis. Id. The ALJ further determined that beginning January 1, 2009, plaintiff had the same severe impairments but also had a history of lateral tibia fracture. Id. At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that significantly

limited, or could be expected to significantly limit, his ability to perform basic work-related activities for twelve consecutive months.  R. 24.

At step four, the ALJ concluded that before January 1, 2009, plaintiff had the residual functional capacity (RFC) to perform a full range of light work.  Id.  However, the ALJ further concluded that beginning January 1, 2009, plaintiff had the RFC to perform less than the full range of sedentary work.  R. 28.  With these conclusions regarding plaintiff's RFC, the ALJ determined that before January 1, 2009, plaintiff was able to perform his past relevant work as a coffee roaster, but that after January 1, 2009, he was disabled.  R. 28-29.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id. (internal quotation omitted).  The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision.  Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed."  Vasquez, 572 F.3d at 591 (internal quotation and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation omitted).

/ / /

5 - OPINION & ORDER

DISCUSSION

Plaintiff alleges that the ALJ made the following errors:  (1) the ALJ failed to develop the record regarding plaintiff's physical limitations before January 1, 2009, particularly in regard to plaintiff's hip and back pain; and (2) the ALJ improperly rejected the opinion of Dr. Saviers regarding plaintiff's functional limitations before January 1, 2009 and along with that rejection, improperly concluded that plaintiff could perform sustained work on a regular and continuing basis.[2]  I address the arguments in turn.

I.  Physical Impairments

In 1982, while serving in the United States Army, plaintiff suffered a severe injury to his right great toe.  See R. 444-45 (Veteran's Affairs (VA) medical provider noting his review of plaintiff's medical record and describing plaintiff's 1982 injury as to the "first MTP" or the "first IP" joint).  As a result of the injury, plaintiff testified during the hearing that he suffers chronic pain and that the injury subsequently caused problems with his knees, hip, and back.  R. 44-46 (describing initial injury, noting no surgery had ever been performed because "they" "missed" the fracture, and describing how the later knee injury was secondary to the foot injury due to the impaired gait caused by the initial foot injury); R. 52 (describing hips being "messed up" due to the injuries stemming from the foot injury and the presence of "lightning pain" shooting through his hips, up through his back, and "out of my arms").  In 2000, an on-the-job injury caused plaintiff to undergo arthroscopic surgery to his left knee including a medial meniscectomy and

---

[2]  Plaintiff also argues that the ALJ's finding at step four that plaintiff can perform his past relevant work is in error, but the basis of that argument is that the hypothetical given to the vocational expert contained a flawed RFC for the reasons plaintiff has previously argued.  Thus, this is not an independent error, but rather, the result of other alleged errors.

debridement.  R. 22, 447.

Over the years, x-rays of plaintiff's foot, knees, and hips demonstrate injuries or degenerative joint disease.  E.g., R. 377 (March 2002 x-rays of plaintiff's left knee showed an irregular spur on the inferior posterior corner of the patella); R. 678 (June 2002 x-rays of right foot showed a mild hallux valgus and bunion deformity of his right foot with no acute fracture, dislocation, or destructive osseous lesion); R. 439-40 (January 2004 x-rays of plaintiff's left knee revealed moderately severe degenerative disease involving all three compartments of the knee); R. 398, 678 (June 2005 x-ray of right foot showed mild hallux valgus with bunion, no acute abnormality, no sign of fracture; June 2005 x-rays of knees showed normal right knee and "some" patellofemoral degenerative change in the left knee); R. 376 (May 2006 x-ray of right foot showed a hallux valgus and early degenerative changes of the first "MP" joint, no arthritic change at other joints and no fractures or deformities); R. 394-95 (February 2007 x-rays of both knees showed mild to moderate degenerative changes present at both knees, a bit more on the left than the right with the patellofemoral joints involved; no visible joint effusion, no visible fracture or focal bone destruction; February 2007 x-rays of both feet showed moderate hallux valgus bilaterally with minimal degenerative change in the metatarsophalangeal joints and no evidence of fracture or focal bone destruction); R. 396 (February 2007 x-rays of the lumbosacral spine showed little degenerative change, but both hips showed degenerative changes); R. 786 (August 2007 pelvis x-ray showed moderate to advanced degenerative changes in both hips); R. 782-83 (August 2008 x-rays of lumbosacral spine showed facet joint arthropathy at L4--L5 and L5-S1; August 2008 x-ray of hips showed osteoarthritis in both hips; August 2008 x-ray of both knees showed moderately severe degenerative osteoarthritis in the medial and patellofemoral

7 - OPINION & ORDER

compartments of both knees with nothing acute).

The ALJ expressly noted the knee x-rays showing the degenerative joint disease of both knees and the right foot x-rays showing the hallux valgus and early degenerative changes of the first metacarpolphalangeal joint.  R. 22.  She also discussed various medical records in support of her conclusion that while plaintiff had objective medical evidence which could reasonably be expected to produce the pain or other symptoms alleged by plaintiff, the allegations of disabling pain before January 1, 2009 were not supported by those medical records.  R. 24-25.

Despite the various x-ray studies noted above, the ALJ noted that Dr. Daniel Saviers reported in April 2004 that plaintiff had normal strength in the left knee and no evidence of ligamentous insufficiency.  R. 25 (citing R. 369).  The ALJ explained that Dr. Saviers found "rotation of the femur on a fixed tibia" to be a major cause of plaintiff's severe pain and ordered a derotation brace for the knee as treatment.  Id. (citing R. 369).

The ALJ also discussed the July 2002 progress notes of podiatrist Dr. David C. Greenberg, D.P.M.  R. 25.  She noted that Dr. Greenberg was unable to determine a clear etiology of plaintiff's pain and suggested shoe orthotics and possible referral to a pain clinic.  Id. (citing R. 361-65).  Despite being ordered orthotics, plaintiff did not return to Dr. Greenberg for four years.  Id.  Then, in 2006, he complained of worsening pain in his right great toe which he contended affected his knee and hip.  Id.  The ALJ noted that although plaintiff reported to Dr. Greenberg that he no longer could work as a roofer, he was working in a coffee shop and taking no medications.  Id.

The ALJ then noted that Adult Nurse Practitioner (NP) Joan Shelby remarked in October 2005 that plaintiff's foot impairment did not impair his ability to work.  R. 25 (citing R. 521).

8 - OPINION & ORDER

The ALJ recited that in April 2007, plaintiff reported that he was a certified housekeeper and wanted to work at the VA hospital but that his job search was complicated by his July 2007 relapse into substance abuse and a history of felony convictions.  R. 26 (citing R. 470, 472, 485, 488, 490).

Other medical records noted by the ALJ showed that (1) in April 2008, plaintiff was able to ascend and descend stairs, his gait was unremarkable, and there was no indication of physical discomfort; R. 26 (citing report by examining psychologist Jane Starbird, Ph.D. at R. 700); (2)  in June and August 2008, he reported that he was going to Portland Community College (PCC) and working in housekeeping at the VA for work study; Id. (citing R. 749, 749); and (3) in December 2008, plaintiff reported he was "doing great" and was looking forward to beginning a position as a housekeeper.  Id. (citing R. 930-31).

Additionally, the ALJ cited the April 2010 VA report of Brent Reed, M.Ed., CRC, who noted plaintiff's participation in a VA vocational-rehabilitation program which provided him with a supported work experience as a housekeeper for four months ending in August 2008.  R. 26 (citing R. 995).  Reed noted that during that time, plaintiff's progress was monitored by a PCC skills trainer and a contract counselor.  R. 995.  Reed stated that plaintiff's "progress reports prove the veteran was very successful and feasible for the job goal of housekeeper [and that he] was able to handle the job [sic] physical demands and all other related aspects."  Id.  As a result, he applied for an open housekeeping position at the VA medical center in Portland.  Id. Unfortunately, as Reed explained, plaintiff was injured in a pedestrian-automobile accident on January 1, 2009, and the resulting injuries prevented him from securing the housekeeping position.  R. 995-96.

Based on her evaluation of all of this evidence, the ALJ concluded that plaintiff's allegations of disabling pain were inconsistent with the medical records and his reports of looking for work after October 17, 2006.  R. 26.  She also noted that he volunteered for the needy and homeless and he acknowledged that his knee brace helped him be active.  Id.

The ALJ noted plaintiff's complaints of back pain, but found no severe impairment to plaintiff's back because there was nothing in the record to show that it was more than transient or caused significant vocational limitations.  R. 24.  She also noted plaintiff's complaints of hip pain to Dr. Greenberg and cited to medical records containing reports of plaintiff's spine and hip x-rays as well as his complaints of hip and back pain.  R. 22 (citing Exs. 5F and 11F).

Plaintiff argues that in formulating her RFC, the ALJ improperly minimized, dismissed, or ignored plaintiff's limitations relating to his hips and low back.  Plaintiff also argues that the ALJ improperly cited to state agency physicians' reports that do not address plaintiff's hip and back impairments.  As a result, plaintiff argues that the ALJ failed to adequately develop the record in this regard and that she should have procured a consultative examination for plaintiff.

Defendant argues that plaintiff's allegations of disabling hip and spine pain were properly discredited by the ALJ because, like the knee and foot impairments, plaintiff's allegations of disabling pain and functional limitations before January 1, 2009, are not supported by the medical records and are inconsistent with plaintiff looking for work after October 2006.

For example, the February 2007 lumbar spine x-rays showed only "little" degenerative change and plaintiff was referred to physical therapy for his "mild arthritis."  R. 396, 498.  The physical therapy notes from April 4, 2007 indicate plaintiff complained of lower back pain radiating into his thighs.  R. 611.  Although he had a moderate limitation in his extension, he had

10 - OPINION & ORDER

good flexion and side glide.  A test of "repetitive flexion in loading" led to increased back pain.

Id.  However, overall, plaintiff tolerated the objective evaluation well.  Id.  The therapist noted

that poor flexibility, posture, and body mechanics could be contributing to his low back pain.  Id.

He was given flexibility and strengthening exercises.  Id.  By May 25, 2007, plaintiff reported

that his back and knees were feeling better.  R. 598.  He told the therapist that he was

interviewing for a housekeeping position.  Id.

    In August 2007, plaintiff went to the emergency room complaining of hip pain.  R. 588.

He did not complain of back pain.  R. 586-88.  On physical examination, Dr. Richard Harper,

M.D., found that plaintiff had pain to deep palpation on the right mid-gluteal region, but there

was no pain to palpation along the anterior hip region, the iliac crests, or the sacro-iliac joints

bilaterally.  R. 587.  Plaintiff had "5/5 m. strength int/ext rotation, ab/adduction, flex/extension

hips bilat" and "5/5" strength in his lower extremities.  Id.  His gait was normal.  Id.  Shortly

thereafter, plaintiff again went to the emergency department complaining of left foot pain and

knee pain traveling up to the left hip.  R. 455-56.  He did not complain of back pain.  Id.  He was

discharged with two days of Vicodin.  Id.

    One year later, on August 13, 2008, plaintiff presented to the VA clinic with a chief

complaint of knee pain.  R. 747.  He did not mention back or hip pain initially.  Id.  Two days

later, on August 15, 2008, he was seen by NP Shelby, his primary care provider, and reported

joint pain in his hips, back, and knees, and requested a brace for his right knee.  R. 746-47.  NP

Shelby noted that he did not previously pick up a brace for his left knee.  Id.  She reviewed and

renewed his medications and then made a referral to orthopedics for further evaluation of his

knees and hips.  R. 743-46.  August 2008 x-rays of plaintiff's lumbar spine showed some facet

joint arthropathy at L4-L5 and L5-SI, but otherwise showed that the lumbar vertebra were normal

in height and alignment with disc spaces maintained and posterior elements intact.  R. 782.  The

sacro-iliac joints were normal and there was no fracture subluxation or focal bony destruction.

Id.

Plaintiff was seen in the orthopedic department on September 4, 2008.  R. 745.  Plaintiff

complained of knee pain, but did not complain of hip and back pain.  R. 743.  Plaintiff's

diagnosis was of bilateral moderate degenerative joint disease.  R. 744.  He was advised to do

quad strengthening exercises and to engage in low impact exercises such as walking, swimming,

or cycling and to avoid high impact activities as well as kneeling and squatting.  R. 744-45.  He

was also advised to use ice ten to twenty minutes per day for pain.  Id.  Surgical knee

replacement was not indicated.  Id.

Plaintiff argues that the ALJ failed to fully develop the record regarding his physical

impairments before January 1, 2009, and that the ALJ should have ordered a consultative

examination.  "An ALJ's duty to develop the record further is triggered only when there is

ambiguous evidence or when the record is inadequate to allow for proper evaluation of the

evidence."  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).  Similarly, the ALJ may

order a consultative examination "when the evidence as a whole is not sufficient to support a

decision on a claim."  20 C.F.R. §§ 404.1519a(b), 416.919a(b).  The ALJ has broad latitude in

ordering consultative examinations.  Reed v. Massanari, 270 F.3d 838, 842 (9th Cir. 2001).

I agree with defendant that the record before the ALJ was neither ambiguous nor

inadequate to allow for proper evaluation of the evidence regarding plaintiff's physical

impairments.  Substantial evidence supported the ALJ's decision that plaintiff was not disabled

before January 1, 2009.

     As to the evidence regarding plaintiff's knees and feet, the ALJ examined the objective medical evidence along with the contemporaneous complaints made to medical providers, the evaluations performed by medical providers, and plaintiff's work history as a roofer, a coffee roaster, and his participation in the housekeeping vocational rehabilitation program. She also noted his expressed desire to work as a housekeeper in 2007 and 2008 which occurred at the same time he alleges that he could not work because of disabling pain.

     The ALJ's reasoning applies equally to plaintiff's complaints of hip and back pain. That is, while x-rays showed degenerative or arthritic problems with plaintiff's hips, the medical records, which the ALJ cited in her decision, reveal an inconsistent history of pain reports related to his hips as well as an absence of functional limitations caused by the hip problems. The x-rays of his spine reveal only mild changes. And, as the ALJ explained, plaintiff's "allegations of disabling pain and limitation are inconsistent with his reports of looking for work after October 17, 2006." R. 26.

     The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Vasquez, 572 F.3d at 591. Notably, in "interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence." Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (internal quotation marks omitted); Harris v. Astrue, No. EDCV 09-1689 SS, 2010 WL 1641341, *9 (C.D. Cal. Apr. 21, 2010) ("ALJ's failure to address every single item in the administrative record does not constitute legal error"). Here, the ALJ issued a detailed twelve-page decision discussing relevant medical evidence, opinions, and testimony. She specifically noted that she had carefully considered "all

the evidence." R. 20. Substantial evidence in the record supports the ALJ's determination. The evidence was not ambiguous and the record was not inadequate. Accordingly, the ALJ did not err by failing to fully develop the record in regard to plaintiff's physical impairments and she was not obligated to arrange for a consultative examination.[3]

II. Dr. Saviers and Social Security Regulation (SSR) 96-8P

Dr. Saviers, a physician at the VA, examined plaintiff on April 28, 2004. R. 368-69. He appears to have made two separate progress notes on that date, one before reviewing plaintiff's x-rays and one after. Id. He initially noted that plaintiff had "3 compartment degenerative changes" in his left knee and that for several years, the use of a heavy duty knee brace "allowed [plaintiff] to be very physically active[.]" R. 369. Unfortunately, plaintiff had lost the brace. Id.

On physical examination, Dr. Saviers noted crepitus in the medial and "PF" compartments and less in the lateral compartment. Id. There was no evidence of any ligamentous insufficiency and strength was "5/5 left knee flex and extension." Id. Dr. Saviers diagnosed plaintiff with "3 compartment" degenerative changes in the left knee, especially involving the medial compartment. Id. He believed that rotation of the femur on a fixed tibia was a major cause of plaintiff's severe pain. Id. He recommended wearing a derotation brace. Id.

In the second progress note, Dr. Saviers indicated that he had reviewed plaintiff's left

---

[3] Moreover, plaintiff's argument regarding the state agency physicians is not well taken. In particular, Dr. Jensen's assessment refers to plaintiff's complaints of pain all over his body and acute chronic pain. R. 722. She also noted references in the record to arthritis pain. R. 727. Dr. Lahr's assessment notes plaintiff's allegation of degenerative joint disease. R. 792. There is no basis to conclude that these non-examining physicians failed to review all of the relevant medical records.

knee x-rays which showed moderate medial and lateral compartment narrowing with some

reactive bone changes in the medial tibial plateau.  R. 368.  He also found a large bone spur off

the medial femoral condyle and a moderate spur of the inferior pole of the patella.  Id.  In looking

at plaintiff's foot x-rays, Dr. Saviers, unlike other medical providers, noted evidence of fractures

within the sesamoid bones.  Id.  He further noted evidence of irregularity of the MT head cortical

surface which he thought might represent an old fracture site.  Id.

His diagnoses were (1) right great toe trauma while in the military with evidence of an

impact fracture of the MT head and a fracture through the underlying sesamoid bones and

subsequent degenerative changes into the MTP joint; (2) metatarsalgia bilaterally and possible

left great toe sesamoiditis to some degree; and (3) moderate to severe "3 compartment"

osteoarthritis of the left knee which could have been caused by a chronic antalgic gait that

restricted weight-bearing on the right foot.  Id.  He recommended that plaintiff do no heavy

lifting and carrying, no squatting, limit his going up and down ladders and stairs, and avoid

running.  Id.  He planned to have plaintiff evaluated by podiatry for possible surgery, and if

surgery were not recommended, then to be fitted for custom made foot orthotics.  Id.  He

continued with his recommendation for a left knee derotation brace.  Id.

In her decision, the ALJ noted that Dr. Saviers's physical examination of the left knee

revealed normal strength and no evidence of ligamentous insufficiency and further, that plaintiff

had acknowledged to Dr. Saviers that a knee brace had allowed him to be physically active, but

that he had lost the brace.  R. 25.  The ALJ accepted Dr. Saviers's recommendation that plaintiff

avoid heavy lifting and carrying and running.  R. 28.  However, she gave "little weight" to his

opinion that plaintiff avoid squatting and limit climbing ladders and stairs because that opinion

15 - OPINION & ORDER

was not supported by the medical records or plaintiff's level of activity, which she noted included
working as a janitor after Dr. Saviers issued his opinion.  R. 28.

Plaintiff argues that the ALJ improperly discounted Dr. Savier's functional limitations
because Dr. Saviers's report was, in fact, based upon objective x-rays.  Plaintiff also argues the
ALJ did not inquire as to the functions and duties of the janitorial work plaintiff performed.
Plaintiff contends that as a result of failing to ascertain the details of plaintiff's
janitorial/housekeeping work, the ALJ lacked sufficient information in the record to conclude
that plaintiff was capable of sustaining full-time work.  Plaintiff argues that this caused the ALJ
to violate SSR 96-8p, available at 1996 WL 374184, which requires the RFC assessment to
consider a claimant's ability to sustain work activities on a regular and continuing basis.

The ALJ, as indicated, rejected certain of Dr. Saviers's functional limitations because,
first, they were not supported by the medical records.  While plaintiff's x-rays established
moderate to severe degenerative changes to the left knee, Dr. Saviers's own progress note
revealed full strength in the left knee and importantly, that plaintiff had been "very" physically
active with a knee brace.  As the ALJ also noted, although plaintiff had been prescribed orthotics
by Dr. Greenberg in July 2002, he never returned to pick them up, even after several phone calls
from Dr. Greenberg's office and he did not see Dr. Greenberg again until 2006.  R. 25 (citing R.
360-65).

In January 2004, just four months before being examined by Dr. Saviers, plaintiff's knee
function was observed on examination "to be fairly good."  R. 439.  In 2008, as the ALJ noted,
Dr. Starbird observed that plaintiff was able to ascend and descend stairs, noted that plaintiff's
gait was unremarkable, and stated that there was no indication of physical discomfort.  R. 26

(citing R. 700).

As to the medical records, the ALJ appropriately resolved conflicts in the medical evidence. She did not err in concluding that certain of Dr. Saviers's functional limitations were not supported by other medical records.

Plaintiff does not dispute that he worked as a janitor/housekeeper after being examined by Dr. Saviers. But, he argues that the ALJ failed to inquire about the specifics of the position and thus, the ALJ had no basis to conclude that his performance of the job was inconsistent with Dr. Saviers's limitations. First, the ALJ did not reject Dr. Saviers's climbing and squatting limitations solely because of plaintiff's later housekeeping work. Rather, she stated that those limitations were not supported by plaintiff's later level of activity, one example of which was his janitorial/housekeeping position. As she noted in her opinion, plaintiff performed substantial gainful activity as a coffee roaster until October 17, 2006, more than two years after Dr. Saviers examined him. R. 19  Testimony at the hearing established that while the Dictionary of Occupational Titles classifies the coffee roasting job as "light work," the work as plaintiff actually performed it was "medium exertion" work. R. 80.  Additionally, plaintiff testified that he did not leave the coffee roasting job because he could no longer perform it physically, but because he was fired. R. 40.  The ALJ also noted that plaintiff continued spending time volunteering for the needy and homeless  R. 26.  The record supports the ALJ's determination that plaintiff's subsequent activities undermined Dr. Saviers's limitations.

Second, as to the housekeeping position, during the hearing, the VE testified that such work is considered "light." R. 83.  "Light work" requires the ability to lift no more than twenty pounds at one time, with frequent lifting or carrying of objects weighing up to ten pounds.  20

C.F.R. §§ 404.1567(b), 416.967(b).  A job falls into the "light work" category even when requiring the lifting of very little weight if it requires a "good deal" of walking or standing or "when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id.  As the ALJ noted, Reed stated that plaintiff had been able to handle the physical aspects of the housekeeping job.  R. 26 (citing R. 995).

The record shows that the ALJ had information about the exertion level required of the housekeeping job.  Plaintiff contends that his activities of working as a housekeeper/janitor were performed either part-time, sporadically, interspersed with rest, or at a pace which would not be compatible with the demands of a competitive work environment.  Plaintiff cites to no evidence in the record supporting his contention that the housekeeping work was performed at any level other than described by the VE.  In fact, the record indicates he was hoping to find a full-time housekeeping position.  R. 930-31 (Nurse Practitioner Linda Gillins noted in December 2008 that plaintiff was looking forward to having a position as a housekeeper and continuing certain medications "as he makes his transition into full time employment").

Additionally, whether plaintiff performed the job at the level of "substantial gainful activity" is not relevant to the ALJ's determination.  It was the very fact that plaintiff could perform the job of janitor/housekeeper at all that provided the inconsistency with Dr. Saviers's climbing and squatting limitations.  Because the ALJ possessed the relevant information about the exertion level required for a housekeeping position, she did not err in concluding that plaintiff's ability to perform the job contradicted certain of Dr. Saviers's limitations. Additionally, because substantial evidence of plaintiff's activities other than the housekeeping position is also inconsistent with Dr. Saviers's climbing and squatting limitations, the ALJ did

18 - OPINION & ORDER

not err in her determination.

"To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state

clear and convincing reasons that are supported by substantial evidence. If a treating or

examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it

by providing specific and legitimate reasons that are supported by substantial evidence." Bayliss

v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).   Here, the ALJ gave specific and legitimate

reasons, supported by substantial evidence, for rejecting the climbing and squatting limitations

provided by Dr. Saviers.  The ALJ did not, as a result, fail to comply with SSR 96-8p because

absent Dr. Saviers's climbing and squatting restrictions, substantial evidence in the record, as

explained throughout this Opinion, supports the ALJ's conclusion that plaintiff retained the RFC

to perform a full range of light work on a sustained basis before January 1, 2009.

CONCLUSION

The Commissioner's decision is affirmed.

IT IS SO ORDERED.

Dated this _____ day of _____, 2012

_____
Marco A. Hernandez
United States District Judge

19 - OPINION & ORDER